**Kevin Winston OSBORN, Petitioner–Appellee,**

v.

**Duane SHILLINGER, Warden of the Wyoming State Penitentiary; A.G. McClintock, the Attorney General of the State of Wyoming, Respondents–Appellants.**

**No. 86–2175.**

United States Court of Appeals, Tenth Circuit.

Nov. 7, 1988.

John W. Renneisen, Sr. Asst. Atty. Gen. (A.G. McClintock, Atty. Gen., Allen C. Johnson, Deputy Atty. Gen., with him on the brief), State of Wyo., Cheyenne, Wyo., for respondents-appellants.

Craig L. Truman of Truman and Associates, Denver, Colo. (Karen A. Chaney of Lozow, Lozow and Elliott, Denver, Colo.; and Ronald Rogers of Cheyenne, Wyo., with him on the brief), for petitioner-appellee.

Before MCKAY and SEYMOUR, Circuit Judges, and SAFFELS,* District Judge.

SEYMOUR, Circuit Judge.

Respondents Schillinger and McClintock [the State] appeal an order from the United States District Court for the District of Wyoming granting Kevin Osborn's petition for writ of habeas corpus. *See Osborn v. Schillinger*, 639 F.Supp. 610 (D.Wyo.1986). We affirm.

---

\* Honorable Dale E. Saffels, United States District Judge for the District of Kansas, sitting by designation.

## I.

## BACKGROUND

On August 8, 1982, Osborn pled guilty to a series of crimes including the felony murder of Jimmy Ray O'Briant, and aiding and abetting the first degree murder of Audry Ditmars. He was sentenced to death on the O'Briant felony murder count. Only the plea and death penalty on that charge are at issue here.[1]

The plea colloquy was facially in conformity with Rule 11 of the Federal Rules of Criminal Procedure. At its conclusion, however, Osborn's counsel at that time, Wyoming Public Defender Leonard Munker, announced that his client would like to have a press conference and that he, as Osborn's attorney, had no objection. At this press conference, Osborn encouraged the American Civil Liberties Union (ACLU) to represent him, asserting that he had felt compelled to plead guilty and to ask for the death penalty.

The ACLU never became counsel of record, but it did file a motion to withdraw Osborn's plea on the ground that he had been under the influence of drugs. Munker apparently refused to file the motion himself but did not object to the ACLU's assistance. The state district court denied the motion to withdraw the plea, but granted Osborn's motion to rescind his death penalty request.

Subsequently, the state court conducted a sentencing hearing under Wyoming's capital sentencing law. Sitting without a jury, the court heard evidence of aggravation and mitigation. Finding two aggravating circumstances [2] and no mitigating evidence, the court sentenced Osborn to death. Execution was automatically stayed pending review by the Wyoming Supreme Court.

Osborn was represented on appeal by Munker, who had handled his guilty plea and sentencing. Munker raised four issues: (1) the voluntariness of Osborn's guilty plea; (2) the proportionality of the death sentence as compared to similar offenders; (3) his own ineffectiveness as counsel; and (4) the constitutionality of Wyoming's death penalty statutes. The Wyoming Supreme Court affirmed the death sentence, *Osborn v. State*, 672 P.2d 777 (Wyo.1983), and Osborn's petition for certiorari to the United States Supreme Court was denied, *Osborn v. Wyoming*, 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984).

Osborn petitioned for post-conviction relief and a writ of habeas corpus in the Wyoming district court in which he had been sentenced.[3] Attorney conflict problems hindered Osborn's pursuit of this relief. Public Defender Munker had raised his own incompetency in Osborn's direct appeal rather than withdrawing. At the post-conviction stage, however, Munker resigned because the ineffectiveness claim was central to that proceeding. He proposed that Martin J. McClain, an attorney

---

1. Osborn's three co-defendants, Willard Teel, Terry Green, and Ellen Hopkins, all pled guilty to the series of crimes before Osborn entered his plea. O'Briant had not yet died from his injuries when they pled, and the State did not seek the death penalty against them. Although Green and Teel had been charged with first degree murder and rape in the death of Ditmars, this crime was committed in a different county whose prosecutor decided not to seek the death penalty. Osborn was not directly involved in the rape/murder and therefore was charged only with aiding and abetting. By the time Osborn pled guilty, O'Briant had died and the State sought the death penalty on this crime only, using the aiding and abetting conviction as an aggravating circumstance.

2. The court found that the felony murder was committed while Osborn was an escaped convict and that Osborn had a prior murder conviction by virtue of his guilty plea to aiding and abetting the murder committed by his co-defendants.

3. In Wyoming, post-conviction relief analogous to relief under 28 U.S.C. § 2255 (1982) is provided by statute. *See* Wyo.Stat. §§ 7–14–101 to 7–14–108 (1977). An appeal from the final resolution of a petition is permitted under the standard state rules of appellate procedure. *See* Wyo.Stat. § 7–14–107 (1977). Habeas corpus relief is also provided by statute. *See* Wyo.Stat. §§ 1–27–101 through 1–27–134. Although no appeal is available, a successive petition may be filed as an original proceeding in the state supreme court. *See generally State ex rel. Hopkinson v. District Court*, 696 P.2d 54, 58–59 (Wyo.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 187, 88 L.Ed.2d 155 (1985).

who worked on a contract basis with the Wyoming Public Defender's Office, represent Osborn. Thereafter, Munker became McClain's direct supervisor when he appointed McClain as the appellate defender for the Public Defender's office. Nonetheless, McClain continued to represent Osborn after accepting this position, and filed a petition for post-conviction relief. The State moved to dismiss the petition.

Because of the apparent conflict of interest, Osborn requested that McClain be removed as his attorney. In the scramble to find representation, Osborn was temporarily represented by John Ackerman, who took over his case in September 1984 with the understanding that he would be replaced in three months. Two and a half months later, Ackerman filed an amended petition for post-conviction relief and a writ of habeas corpus to which the State filed a renewed motion to dismiss. On February 19, 1985, Osborn's fifth counsel, Craig L. Truman, entered his appearance and responded to the motion to dismiss. In an opinion letter on March 25, the state district court denied Osborn's petition. The court entered an order to that effect on May 13, 1985.

Osborn did not appeal the state court's denial of his consolidated petition. On September 12, 1985, he filed a motion for stay of execution with the state district court, and on September 18, he filed a motion in that court for reconsideration of the dismissal of his consolidated petition. The docket sheet reflects only that, on September 18, 1985, the state district court entered an order denying Osborn's motion to stay, but it is apparent from the record that both

parties believed the court also had denied the motion to reconsider. On September 19, Osborn filed a motion to stay with the Wyoming Supreme Court and a notice of appeal of the district court's September 18 rulings. On September 23, the Wyoming Supreme Court denied Osborn's request for stay but did not rule on the appeal.

Osborn filed his petition for federal habeas corpus relief the next day. The federal district court granted a stay and conducted evidentiary hearings, which were completed on October 11, 1985. On January 10, 1986, the State filed a motion with the Wyoming Supreme Court to dismiss Osborn's appeal from the state district court's denial of his motion to reconsider its dismissal of his consolidated petition. The supreme court granted the motion the same day, apparently construing Osborn's appeal from the denial of his motion to reconsider as an untimely appeal from the May 13 denial of his consolidated petition.[4]

The federal district court granted Osborn's petition for habeas corpus relief on July 7, 1986. The court found that Osborn's guilty plea was not voluntary because his counsel had told him he could withdraw the plea if he decided to withdraw his request for the death penalty. In addition, the court held that Munker's representation of Osborn during his guilty plea proceedings and at his sentencing trial constituted ineffective assistance of counsel, and that the trial court's exposure to ex parte information about the leadership relationship between Osborn and his co-defendants constituted a violation of Osborn's due process rights. Because the effective assistance of counsel issue is dispositive,

---

4. Although Osborn had moved the state district court to reconsider the denial of both post-conviction relief and the writ of habeas corpus, the notice of appeal stated only that Osborn was appealing the refusal to reconsider his writ of habeas corpus. As set forth in note 3 supra, under Wyoming law a petitioner may appeal the denial of post-conviction relief, but must file an original petition for writ of habeas corpus with the Wyoming Supreme Court rather than appealing the lower court's denial of the writ. Osborn's out-of-state counsel may have been unaware of this distinction in avenues of collateral relief in Wyoming because the motion for stay filed with the Wyoming Supreme Court at the

same time Osborn filed his notice of appeal clearly indicated that he was seeking relief from that court through both post-conviction procedures and habeas corpus. The Wyoming Supreme Court's January 10 order, although cryptic, appears to rest in part on Osborn's attempt to appeal a nonappealable order. In Part II.B.3. infra, we conclude that the dispositive fact for purposes of procedural bar is Osborn's failure to take any appeal from the May 13 denial of his consolidated petition. Accordingly, his attempt to appeal the denial of his motion to reconsider, although relevant to exhaustion, has no bearing on the issue of procedural bar.

we need not reach the merits of the other issues.

## II.

## PROCEDURAL ISSUES

Before we can address the merits of Osborn's habeas corpus petition, we must determine whether the federal district court acted within its discretion in reaching the merits. The State argues that Osborn did not exhaust his state remedies and/or that his claims were resolved in the state courts on adequate and independent state procedural grounds. The district court held that Osborn had exhausted state remedies and that no state procedural rule bars federal consideration. We agree with these conclusions, although our reasoning is somewhat different from that employed by the district judge.

### A. Exhaustion of State Remedies

The law is well settled that as a matter of comity, federal courts should not consider a claim on habeas corpus until after the state courts have had an opportunity to act. *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (per curiam); *Duckworth v. Serrano*, 454 U.S. 1, 3–4, 102 S.Ct. 18, 19–20, 70 L.Ed.2d 1 (1981) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Jones v. Hess*, 681 F.2d 688, 693–94 (10th Cir.1982). To fulfill the exhaustion requirement, a petitioner must present his claim to a state appellate court. *White v. Meachum*, 838 F.2d 1137, 1138 (10th Cir.1988). If Osborn presented the substance of his claims to the Wyoming Supreme Court on direct appeal, the availability of a post-conviction petition or further original petition in the supreme court would be irrelevant. *Smith v. Atkins*, 678 F.2d 883, 884–85 (10th Cir.1982). When Osborn filed his federal petition, however, the Wyoming Supreme Court still had not decided his appeal from the denial of his motion for reconsideration of the ruling on the consolidated petition, which raised at least one claim for the first time. Osborn had therefore not completely exhausted his state remedies when the district court ad-

dressed the merits of his petition. *White*, 838 F.2d at 1138.

While the instant appeal was pending, the Wyoming Supreme Court dismissed Osborn's last appeal. "[A]n appellate court may give relief if state remedies are exhausted by the time it acts, even if those remedies were not exhausted when the habeas corpus petition was filed." *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1344 (9th Cir.1984) (citing *Sharpe v. Buchanan*, 317 U.S. 238, 63 S.Ct. 245, 87 L.Ed. 238 (1942) (per curiam)). Osborn's claims are unquestionably exhausted now.

### B. Procedural Bar

The State argues that the federal district court should not have addressed the merits of Osborn's petition because he violated several state procedural rules. The federal district court construed the order of the state court as merely denying an evidentiary hearing on procedural grounds, rather than the entire petition on that basis, and thereafter denying the petition on the merits. The court then held that federal habeas review is appropriate under such circumstances. *See Ulster County Court v. Allen*, 442 U.S. 140, 152–54, 99 S.Ct. 2213, 2222–23, 60 L.Ed.2d 777 (1979) (federal review not precluded if state court reached merits); *Andrews v. Shulsen*, 802 F.2d 1256, 1266 n. 8 (10th Cir.1986) (same). The State contests this holding, claiming that the state court denied all of Osborn's claims on two separate procedural grounds: failure to file proper affidavits, and failure to raise issues on direct appeal. The State also argues that Osborn is barred by his failure to file a timely appeal from the denial of his petition for post-conviction relief in state court. The State contends that Osborn cannot show cause for these defaults, and/or that they amount to a deliberate bypass of state remedies.

1. Failure to Present Sufficient Affidavits with the Petition for State Post–Conviction Relief

   a. *As complete bar*

   The State first argues that the state court's denial of Osborn's consolidated peti-

tion was based at least in part on Osborn's failure to attach adequate documentary support for the claims of attorney ineffectiveness alleged. The State's argument on this point is unclear. We therefore address several possible alternatives.

The State contends that verification of the post-conviction petition on information and belief and the failure to file additional support by affidavit allowed the state court to dismiss the claim on procedural grounds without reaching the merits. "We have previously stated that to determine whether federal habeas corpus relief is barred, the federal habeas court 'must inquire not only if there is a state procedural bar, but whether the state itself applied the bar.'" *Brasier v. Douglas*, 815 F.2d 64, 65 (10th Cir.1987) (quoting *Morishita v. Morris*, 702 F.2d 207, 209 (10th Cir.1983)), *cert. denied*, — U.S. —, 107 S.Ct. 3271, 97 L.Ed.2d 769 (1987). While the state court's opinion is not altogether clear, for the reasons set out below we believe a reasonable reader would conclude, as did the court below, that the state court dismissed Osborn's petition for failure to state a claim. Such a disposition is a decision on the merits. *See Baker v. Carr*, 369 U.S. 186, 200, 82 S.Ct. 691, 700, 7 L.Ed.2d 663 (1962); 2A J. Moore, J. Lucas & G. Grotheer, Jr., *Moore's Federal Practice* ¶ 12.07 [2.–5] (2d ed. 1987). *See also Kimbley v. City of Green River*, 642 P.2d 443, 445 n. 3 (Wyo. 1982) (federal authority "highly persuasive" in interpreting a dismissal under W.R.C.P. 12 because it is virtually identical to its federal counterpart). Under such circumstances, federal review is not precluded. *Cf. Ulster County*, 442 U.S. at 153–54, 99 S.Ct. at 2222–23 (1979).

Wyoming statutory law requires a petition for post-conviction relief to be verified by affidavit, and the allegations to be supported by affidavits or otherwise.[5] The state court began its opinion by quoting the Wyoming Supreme Court's statement in *State ex rel. Hopkinson v. District Court*, 696 P.2d 54 (Wyo.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 187, 88 L.Ed.2d 155 (1985), that "the appellant makes bald conclusions of fact in the body of the petition." Rec., vol. V., def. ex. HH–1, at 1. If the court had intended to dismiss the petition on the procedural ground that it was not verified and without supporting affidavits, the court would not have found it necessary to discuss whether the petition contained bald conclusions or detailed factual explanations. The procedural default would have barred the claim whether or not it appeared to have merit on its face.

The state court did quote portions of *Hopkinson* that stress the importance of affidavit support. Rather than conclude, however, that Osborn's ineffectiveness claim was procedurally barred because it did not have sufficient supporting affidavits, the court ended its opinion by asserting that

> " 'Before a person is entitled to an evidentiary hearing *he must present initially a substantial claim, and some specificity is required. An application is properly denied without a hearing where it states only bald legal conclusions with no supporting factual allegations....* Here there were no factual allegations supporting the contention which was in conclusory form. The law does not grant an absolute right to an evidentiary hearing on the application.'
>
> In this case the allegations in appellant's petition consist principally of bald legal conclusions sans specificity."

5. The statutes governing Wyoming post-conviction relief provide in pertinent part as follows:

"Any person serving a felony sentence in a state penal institution who asserts that in the proceedings which resulted in his conviction there was substantial denial of his rights under the constitution of the United States or the state of Wyoming, or both, may institute proceedings under this act. The proceeding shall be commenced by filing with the clerk of the court where the conviction occurred a petition verified by affidavit."
Wyo.Stat. § 7–14–101(b) (1977 & 1988 Cum. Supp.).

"The petition shall be accompanied by affidavits, records or other evidence supporting the allegations or shall state why the same are not attached."
Wyo.Stat. § 7–14–102(b) (1977).

*Id.* at 5–6 (quoting *Bibbins v. State,* 696 P.2d 1300, 1303 (Wyo.1985) (emphasis added)). This passage would have been unnecessary if the court were dismissing the petition solely for failure to file the required affidavits. We decline to read the last paragraph of the court's reasoning as irrelevant.

Admittedly, the state court's opinion does not clearly state its basis for decision on each of Osborn's separate claims. The quoted sections, however, indicate that the court examined Osborn's allegations and determined them to be insufficient to justify relief. Particularly in a death penalty case, we will not ignore such passages and infer exclusive reliance on procedural grounds when the district court did not explicitly state that its decision rested on such grounds.[6] *Cf. Robison v. Maynard,* 829 F.2d 1501, 1513 (10th Cir.1987) ("[I]t is almost inconceivable to assume an appellate court's willingness to stand upon a mechanistic application of a procedural rule to thwart consideration of a legitimate appellate issue in a death penalty case.").

Nor is federal review barred by the fact that the state court's opinion may reasonably be read as alternatively dismissing Osborn's petition for the independent procedural reason that he failed to file the required affidavits. We have held that when a state court alternatively "review[s] petitioner's claims on the merits, procedural default d[oes] not preclude the federal habeas court from addressing the claims," because "the state courts have not relied exclusively upon" the procedural ground. *Brasier,* 815 F.2d at 65 (quoting *Thompson v. Estelle,* 642 F.2d 996, 998 (5th Cir.1981)).

Finally, even if we were to accept the State's argument that the district court dismissed Osborn's petition *solely* because it was not accompanied by sufficient affidavits, we would conclude that federal review

is not barred. The Supreme Court has "uniformly acknowledged that federal courts are empowered under 28 U.S.C. § 2254 to look beyond a state procedural forfeiture and entertain a state prisoner's contention that his constitutional rights have been violated." *Reed v. Ross,* 468 U.S. 1, 9, 104 S.Ct. 2901, 2907, 82 L.Ed.2d 1 (1984). The Court has "consistently held that the question of when and how defaults in compliance with state procedural rules can preclude [a federal court's] consideration of a federal question is itself a federal question." *Johnson v. Mississippi,* —— U.S. ——, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988) (quoting *Henry v. Mississippi,* 379 U.S. 443, 447, 85 S.Ct. 564, 567, 13 L.Ed.2d 408 (1965)). A procedural rule that is not a "firmly established and regularly followed state practice" cannot, as a matter of federal law, bar federal review. *See James v. Kentucky,* 466 U.S. 341, 348–49, 104 S.Ct. 1830, 1835–36, 80 L.Ed.2d 346 (1984); *see also Johnson,* 108 S.Ct. at 1987; *Barr v. City of Columbia,* 378 U.S. 146, 149, 84 S.Ct. 1734, 1736, 12 L.Ed.2d 766 (1964) ("We have often pointed out that state procedural requirements which are not strictly or regularly followed cannot deprive us of the right to review."); *Reynolds v. Ellingsworth,* 843 F.2d 712, 717 (3d Cir.1988). *Cf. Hathorn v. Lovorn,* 457 U.S. 255, 262–63, 102 S.Ct. 2421, 2426–27, 72 L.Ed.2d 824 (1982).

Determining whether a state procedural bar is sufficient to preclude federal review in a particular case is admittedly difficult. The cases cited above, however, lead us to conclude that if a petitioner could not reasonably have been aware that a procedural rule would prevent the court from addressing the merits of his claim, his violation of that rule cannot bar federal review. *See Reynolds,* 843 F.2d at 720–22; *Wheat v. Thigpen,* 793 F.2d 621, 625 (5th Cir.1986) ("If the state does not clearly

---

**6.** We recognize that the state court did hold that some issues were procedurally barred because they were either not raised on direct appeal or were fully addressed there. For example, Osborn's claim of ineffective assistance of counsel on the basis of the trial record was addressed by the Wyoming Supreme Court on direct appeal. Osborn's claim of ineffective counsel on the

basis of information not in the record, however, was not and could not have been raised on direct appeal because it required additional fact findings. *See* part III.B.2. infra. Therefore, the court could not have been referring to this claim in mentioning these other procedural bars.

announce the procedural rule . . . , then the federal courts may reach the issue the state court refused to address."); *Spencer v. Kemp*, 781 F.2d 1458, 1470–71 (11th Cir. 1986) (en banc); *see also, Henry v. Mississippi*, 379 U.S. 443, 448 n. 3, 85 S.Ct. 564, 567 n. 3, 13 L.Ed.2d 408 (1965) (state rule is adequate when reasonable and "clearly announced to defendant and counsel").

We are convinced that Wyoming law at the time the petition was filed did not give Osborn or his attorney notice that the petition would be rejected because it failed to comport with Wyoming procedural requirements. To preclude review of a federal constitutional claim under the facts of this case would thus be unfair in exactly the same ways identified by the Supreme Court and the circuit opinions cited above.

*Hopkinson*, the principal case upon which the State relies, did suggest that under section 7–14–101 of the Wyoming statutes, a petition supported by an affidavit based solely upon personal knowledge is insufficient, explaining in detail why affidavits based upon information and belief are problematic. *See* 696 P.2d at 62–63. Much of the opinion, however, emphasized the lack of any factual allegations in support of the petitioner's conclusory claims. *See id.* at 65–72. Thus, *Hopkinson* cannot be read as a blanket statement that a state post-conviction court must dismiss a petition without a hearing whenever its affidavit support is found wanting in any respect no matter how compelling the claims presented. *Cf. Reynolds*, 843 F.2d at 720 ("Where a purported new, sweeping procedural requirement is not even explicitly formulated in the opinion upon which the state courts rely to deny review, . . . it lacks the requisite degree of specificity and clarity—in short, the 'unmistakable terms'—necessary to bar federal courts from habeas review.").

Section 7–14–101 was in existence when Osborn filed his post-conviction petition. The statute, however, does not explicitly say that an affidavit *based upon information and belief* is invariably insufficient. All post-conviction cases before *Hopkinson* that dismissed the petition focused upon the lack of factual specificity in the allegations rather than the absence of a sufficient personal knowledge verification. *See, e.g., Boggs v. State*, 484 P.2d 711 (Wyo. 1971). Even *Hopkinson* emphasizes primarily the lack of factual allegations in the petition, *see* 696 P.2d at 61–65, and a later case cites *Hopkinson* for the proposition that a petitioner "must plead a substantial claim and demonstrate how the allegations can be proven." [7] *Pote v. State*, 733 P.2d 1018, 1021 (Wyo.1987).

Wyoming cases in other areas that turn on the distinction between affidavits based upon personal knowledge and those based upon information and belief suggest that the latter are adequate if the factual bases for the allegations are explicitly stated. For example, the Wyoming Constitution requires an officer applying for a warrant to demonstrate probable cause supported by an affidavit. *See* Wyo. Const. art. I, § 4. In *State v. Bruner*, 78 Wyo. 111, 319 P.2d 863 (1958), the defendant argued that the constitutional affidavit requirement meant an affidavit based upon personal knowledge. The Wyoming Supreme Court disagreed, holding that the prosecutor's affidavit was sufficient to fulfill the constitutional requirement even though it was based on information and belief. *Id.* 319 P.2d at

---

7. The Supreme Court has held that "[s]tate courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims." *Hathorn*, 457 U.S. at 263, 102 S.Ct. at 2426. In deciding whether this condition has been met, courts have considered whether state courts sometimes ignore the particular procedural rule in question in order to determine if their reliance on it in a particular case is an adequate and independent state ground for relief. *Wheat v. Thigpen*, 793 F.2d 621, 626–27 & n. 4 (5th Cir.1986). Unfortunately, the nature of the rule in this case makes that approach unavailable to us. Wyoming courts are unlikely to mention in their opinions that they decided *not* to summarily dismiss a post-conviction petition although the petitioner did not completely comply with the affidavit requirement. The absence of any case dismissing a post-conviction claim solely because the petition was verified on information and belief, however, is some evidence that the rule is not clearly established. We have found no case where a Wyoming court has dismissed a petition as detailed and specific as this one on the basis of the procedural rule at issue here.

864–65. In discussing this holding in *Hopkinson,* the supreme court stated that "[v]erification on information and belief, where there is contained in the affidavit statements in positive terms setting out the facts upon which the information and belief are founded, may furnish support. The underlying circumstances must be detailed. Facts which lead the affiant to believe must be presented." *Hopkinson,* 696 P.2d at 63 (citations omitted).

The allegations in Osborn's petition are stated in considerable detail. At each point, facts and reasoning flow smoothly to a conclusion that impropriety occurred. The information stated is in many instances information which Osborn's attorney would have acquired in the course of his investigation of the case. A representative example from Osborn's amended petition reads as follows:

"On July 16, 1984, following the communication or lack thereof between McClain and Osborn, Attorney Munker mailed a letter to Tim Ford attempting to absolve the public defender's office of claims of inadequate assistance and impugning the integrity of his client. This correspondence relied in part upon confidential communications between Osborn and both attorney Munker and attorney McClain. Inexplicably and mysteriously, copies of this letter were mailed to the trial judge and the Chief Justice of the Wyoming Supreme Court."

Rec., vol. V, def. ex. HH–2 at 90. As this excerpt illustrates, Osborn's petition does not assert in a conclusory fashion that he received ineffective assistance of counsel. It sets out in detail the facts which led him and his counsel to reach that conclusion. Whether such a petition is sufficient after *Hopkinson* is a matter of state law upon which we express no view. Based on state law prior to *Hopkinson,* however, section 7–14–101 could fairly be read as permitting the filing of petitions supported by affidavits based on information and belief so long as the petitions were fact-specific rather than conclusory.[8] *Cf. Reynolds,* 843 F.2d at 721 (interpreting state statute at time of alleged bypass to permit petitioner's actions, thus making State's asserted procedural bar inadequate).

In addition to the less-than-definite state of Wyoming law at the time Osborn filed his amended petition, the petition apparently comported with the format used by the state public defender's office. Osborn's first petition, prepared by McClain who worked on contract for the defender's office, was supported by two affidavits. One, signed by McClain, stated that he had read the petition and the contents were true to his knowledge, "except such matters as are stated to be upon information and belief." Rec., vol. V, def. ex. HH–2 at 21. The second affidavit, filed by an investigator, stated that he had read the petition and "based upon information and belief, believe[d] it to be true and correct insofar as its allegations reflect my investigation." *Id.* at 22. In a section entitled "affidavits and supporting documents," the petition listed five reasons why no additional documents were attached.[9] Included in this

---

**8.** Because *Hopkinson* was decided several months after Osborn filed his petition, any new state rule announced there would not bar federal review of Osborn's claims. *See generally, Spencer v. Kemp,* 781 F.2d 1458 (11th Cir.1986) (en banc).

**9.** "AFFIDAVITS AND SUPPORTING DOCUMENTS

"Petitioner has not attached the affidavits, records and other evidence supporting these allegations to this Petition, for the following reasons:

"A. Some of the facts are matters of record in this case, and the records are already before this Court and need not be duplicated;

"B. Additional facts have been discovered by an ongoing investigation which at this point, is incomplete. Petitioner's counsel understands that the Court has informally indicated that a hearing will be permitted to present this evidence;

"C. Some witnesses are not readily available to Petitioner to sign affidavits at this time. Some of these are out-of-State, in the States of Alabama, Georgia and Colorado. Others may be legally disqualified from signing affidavits absent an order from this Court, because of judicial, attorney-client, or work product privileges. Additionally, Petitioner has initiated proceedings in an attempt to obtain medical records in the State of Alabama relative to certain of his claims;

"D. Although Petitioner does have some affidavits which can be submitted at this time, and is in the process of preparing others, he

section was the following statement: "Petitioner's counsel understands that the Court has informally indicated that a hearing will be permitted to present this evidence." *Id.* at 19.

Osborn's amended petition was filed by John Ackerman, an out-of-state attorney who accepted the case on a temporary basis until permanent counsel could be found. This petition contained affidavits from Ackerman and the investigator similar to those in the first petition. It also repeated the reasons why no other supporting documents were attached, using language identical to that in the first petition. Ackerman attached an additional affidavit that read as follows:

> "On December 19, 1984 I reviewed the contents of this petition with Kevin Osborn, by telephone. He stated that the allegations herein are true and authorized me to sign this petition with his name and in his behalf."

Rec., vol. II, def. ex. HH–2 at 101.

In submitting the petition in this fashion, Osborn's attorneys copied the format previously used by the state public defender's office. That office had used the identical form in *Hopkinson,* and we may reasonably infer that it did so in *Bibbins* as well. All indications are that the state public defender regularly used this form of support for state post-conviction petitions, and that *Hopkinson* signaled the Wyoming Supreme Court's view that the form was no longer sufficient. "Where [as in this case] it is inescapable that the defendant sought to invoke the substance of his federal right, the asserted state-law defect in form must be more evident than it is here." *James,* 466 U.S. at 351, 104 S.Ct. at 1836.

▆ In conclusion, we believe that a fair reading of the state court's opinion indicates that it decided on the merits the ineffectiveness claim that could not have been raised on direct appeal, or at least that it decided it on alternative grounds. Even assuming that the state court exclusively relied upon Osborn's procedural failure to support his petition with a sufficient verification or additional affidavits, we conclude that the combination of unclear Wyoming law at the time the petition was filed, and the filing of a petition virtually identical to the form used by the state public defender's office, preclude a finding that the bar at issue here was sufficiently regularized and consistently applied at the time Osborn filed his amended petition to preclude federal review.

#### *b. As bar to evidentiary hearing*

Although we conclude that Osborn's failure to satisfy Wyoming's affidavit requirement does not bar federal review on the merits, the relevant issues in Osborn's petition turn on factual disputes that could not have been resolved on the basis of the state court record. An evidentiary hearing was therefore essential to any meaningful decision on the merits. Although never precisely articulated, the State appears to argue that Osborn deliberately bypassed a full and fair opportunity for a hearing in state court, thereby precluding the federal habeas court from engaging in additional fact-finding. Without additional fact-finding, the federal court would necessarily have been required to dismiss the petition because the record contained insufficient evidence to prove the relevant claims.

The State relies on *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), where the Court held that when "an applicant for a writ of habeas corpus alleg-

---

has attempted to first set out all his claims by the date fixed by this Court. Petitioner does not believe any purpose would be served by filing some, but not all, of these affidavits at this time;

"E. Petitioner will be submitting additional memoranda and motions regarding the development of the facts and the proceedings in this case, and wishes to await the Court's guidance regarding the scope of evidence before his full evidentiary submission.

"Petitioner does not mean to waive or abandon any of his claims by not submitting the evidence supporting them at this time, does not understand that he might do so by submitting the Petition in this form. Petitioner will submit his affidavits and evidence at any hearing, or at any earlier time, the Court requires."

Rec., vol. V, def. ex. HH–2 at 18–19. ·

es facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew." *Id.* at 312, 83 S.Ct. at 757. When state courts have not made the necessary findings to decide a constitutional claim properly before the federal court, *Townsend* requires federal fact-finding procedures. *Id.* at 313–14, 83 S.Ct. at 757–58. The Court stated, however, that when state courts make fact-findings in full and fair state proceedings, reviewing federal courts should give deference to those findings. *Id.* at 318, 83 S.Ct. at 759. This latter holding was codified in substantially similar form. *See* 28 U.S.C. § 2254(d).

■ The State correctly argues that *Townsend* does not compel a federal court to hold an evidentiary hearing if the state's failure to develop the relevant facts was due to the "inexcusable neglect of [the] petitioner." *Id.* at 317, 83 S.Ct. at 759. This passage is irrelevant when, as here, a district court exercises its discretion to hold an evidentiary hearing in the interests of justice. *Townsend* thus holds that a district court may conduct an evidentiary hearing in every case where the merits of a constitutional claim are properly before it,[10] and lists a number of situations where a federal court hearing is required. Section 2254(d) requires federal habeas courts to give deference to state fact findings unless certain exceptions apply. But neither *Townsend* nor section 2254(d) preclude federal courts from taking evidence in order to make findings that state courts have not made. When discussing the inexcusable neglect standard, the Court merely held that a federal court is not *required* to hold an evidentiary hearing when the state court's failure to adequately develop the necessary facts was due to the petitioner's inexcusable neglect, not that the federal court is precluded from doing so. *See Townsend*, 372 U.S. at 317, 83 S.Ct. at 759.

In any event, Osborn's failure properly to verify the petition was not due to inexcusable neglect because his out-of-state attorney did not have notice that the petition was so insufficient when it was filed that the state court would refuse to hold an evidentiary hearing. As we have stated, a fact-specific affidavit on information and belief was seemingly sufficient under then existing state law, and Osborn's attorney followed the format used by the state public defender's office.

### 2. Failure to Raise Issue on Direct Appeal

■ The State argues that because Osborn failed to raise on direct appeal the ineffective assistance claim he now urges, state procedural law bars him from asserting this claim in subsequent state or federal proceedings absent a showing of cause and prejudice. We agree that the failure to raise a constitutional claim at trial or on direct appeal generally will prohibit federal collateral review of that claim absent cause and prejudice. *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). However, although a state can limit the litigation of some constitutional claims to trial and direct appeal, the Supreme Court has held that ineffective assistance claims may be brought for the first time collaterally. *See Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 2585, 91 L.Ed.2d 305 (1986). The Court explained its rationale as follows:

"Because collateral review will frequently be the only means through which an accused can effectuate the right to counsel, restricting the litigation of some Sixth Amendment claims to trial and direct review would seriously interfere with an accused's right to effective representation. A layman will ordinarily be unable to recognize counsel's errors and to evaluate counsel's professional performance, consequently a criminal defendant will rarely know that he has not been represented competently until after

10. The passage of time has apparently not altered this principle. Recent case law continues to affirm that *Townsend* "sets forth circumstances in which the district court must hold an evidentiary hearing; absent such circumstances, the decision to hold a hearing is within the discretion of the district court." *Craker v. Procunier*, 756 F.2d 1212, 1214 (5th Cir.1985); *see Streetman v. Lynaugh*, 812 F.2d 950, 958 (5th Cir.1987).

trial or appeal, usually when he consults another lawyer about his case."

*Id.* (citations omitted).

■ Moreover, ineffectiveness claims are ordinarily inappropriate to raise on direct appeal because they require additional fact-finding. *See United States v. Pelletier*, 845 F.2d 1126, 1131 (1st Cir.1988); *United States v. Griffin*, 699 F.2d 1102, 1107–09 (11th Cir.1983); *cf. United States v. Winkle*, 722 F.2d 605, 611–12 (10th Cir. 1983) (remanding ineffectiveness claim for additional fact finding). Where, as here, an ineffectiveness claim cannot be made on the basis of the record and the allegedly ineffective counsel handled both the trial level proceedings and the direct appeal, a petitioner may raise an ineffective assistance of counsel claim for the first time collaterally.

3. Failure to File Timely Appeal

As set out above, Osborn attempted to appeal the denial of his motion to reconsider, although he had not appealed the denial of the underlying relief on which the motion to reconsider was based. The State's motion to the Wyoming Supreme Court to dismiss Osborn's appeal, and the court's subsequent dismissal, were apparently based in part on Osborn's initial failure to appeal the denial of his petition for post-conviction relief. In a very unfocused argument, the State now appears to assert that Osborn is barred from federal habeas relief by his failure to appeal the denial of his petition for post-conviction relief.

a. *The standard*

■ The first question we must address is the procedural default standard applicable in determining whether the failure to appeal the denial of a state post-conviction petition precludes federal redress of a constitutional claim. In *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), the Supreme Court considered procedural bar in the context of the petitioner's failure to take a direct appeal from a state court conviction. The Court held that such a petitioner is barred if he has "deliberately by-passed the orderly procedure of the state courts and in so doing has forfeited his state court remedies." *Id.* at 438, 83 S.Ct. at 849. The Court described deliberate bypass as " 'an intentional relinquishment or abandonment of a known right or privilege.' " *Id.* at 439, 83 S.Ct. at 849 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). The Court further explained that

"[i]f a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits— though of course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing upon the applicant's default."

*Id.* The Court has never overruled *Fay*, and has twice reserved the issue of whether a failure to file an appeal at all falls under the cause and prejudice standard. *See Wainwright v. Sykes*, 433 U.S. 72, 88 n. 12, 97 S.Ct. 2497, 2507 n. 12, 53 L.Ed.2d 594 (1977); *Car. ier*, 106 S.Ct. at 2648.

A persuasive argument can be made that the deliberate bypass standard remains applicable to fundamental decisions made by the defendant himself as opposed to strategic legal issues decided by his attorney. *See Sykes*, 433 U.S. at 92–94, 97 S.Ct. at 2509–10 (Burger, C.J., concurring). By stressing that ineffective assistance of counsel and new developments in the law are a clear means of showing "cause," *see Carrier*, 106 S.Ct. at 2646, the Court has indicated that the cause and prejudice test is best suited to address attorney decisions. *See, e.g., Reed*, 468 U.S. at 11, 104 S.Ct. at 2907 (asserting that cause and prejudice test applies where "defendant has failed to abide by a State's procedural rule *requiring the exercise of legal expertise and judgment*") (emphasis added)); *cf. Ama-*

*deo v. Zant,* —— U.S. ——, 108 S.Ct. 1771, 1776, 100 L.Ed.2d 249 (1988). Following this rationale, we have consistently held with respect to direct appeals that until the Supreme Court overrules *Fay,* "we shall apply the rule of that case at least to situations in which no state appeal has been taken." *Holcomb v. Murphy,* 701 F.2d 1307, 1310 (10th Cir.), *cert. denied,* 463 U.S. 1211, 103 S.Ct. 3546, 77 L.Ed.2d 1394 (1983); *see Worthen v. Meachum,* 842 F.2d 1179, 1181 (10th Cir.1988); *accord Crick v. Smith,* 650 F.2d 860, 867 (6th Cir.), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); *Boyer v. Patton,* 579 F.2d 284, 286 (3d Cir.1978).[11]

Our own decision in *Holcomb* and the Supreme Court's recent decisions in *Reed* and *Murray* convince us that the *Fay* standard continues to apply to decisions which properly rest with the defendant/petitioner. *See Hughes,* 800 F.2d 905, 910–14 (9th Cir.1986) (Nelson, J., dissenting) (discussing the failure-to-appeal issue in detail). The ultimate decision whether to file a post-conviction appeal properly rests with the petitioner, just as it does in deciding whether to file a direct appeal. We thus apply the deliberate bypass standard to Osborn's failure to file a timely appeal from the denial of his state petition for habeas relief.

*b. Application of the standard*

■ Although the State makes a general assertion that Osborn deliberately bypassed his state remedies, the State has never argued or pointed to any evidence showing that Osborn's failure to appeal the May 13 order denying the consolidated petition was due to his own deliberate decision to forego his right to appeal that denial. Our examination of the record reveals nothing tending to establish that Osborn himself intentionally and knowingly relinquished his right to appeal the denial of

post-conviction relief within the meaning of *Fay.* Under these circumstances, we conclude that Osborn is not barred by his failure.

## III.

## INEFFECTIVE ASSISTANCE OF COUNSEL

The Supreme Court has long "recognized that 'the right to counsel is the right to effective assistance of counsel'" under the Sixth Amendment. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984); (quoting *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970)), *United States v. Cronic,* 466 U.S. 648, 655, 104 S.Ct. 2039, 2044, 80 L.Ed. 2d 657 (1984). An effective attorney "must play the role of an active advocate, rather than a mere friend of the court." *Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 835, 83 L.Ed.2d 821 (1985); *Cronic,* 466 U.S. at 656, 104 S.Ct. at 2045; *Anders v. California,* 386 U.S. 738, 743, 87 S.Ct. 1396, 1399, 18 L.Ed.2d 493 (1967). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064. Forty years ago, Justice Black articulated the Sixth Amendment right to counsel as follows:

"The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client.... Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision. And nowhere is this service deemed more honorable than in case of

---

11. Some circuits have applied the cause and prejudice standard to failures to file a direct appeal. *See Clark v. Texas,* 788 F.2d 309, 310–11 (5th Cir.1986); *Nutall v. Greer,* 764 F.2d 462, 464 (7th Cir.1985). Some circuits also apply that test to the failure to file an appeal from the denial of post-conviction relief in state court.

*Williams v. Duckworth,* 724 F.2d 1439, 1442–43 (7th Cir.1984); *see Hughes v. Idaho State Bd. of Corrections,* 800 F.2d 905, 907–08 (9th Cir.1986). No court has offered any rationale for distinguishing between direct appeals and appeals from adverse collateral decisions.

appointment to represent an accused too poor to hire a lawyer, even though the accused may be a member of an unpopular or hated group, or may be charged with an offense which is peculiarly abhorrent."

*Von Moltke v. Gillies,* 332 U.S. 708, 725–26, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948).

The most common means by which an attorney may fail to function as his client's advocate in the absence of affirmative state interference involves a conflict of interest arising from multiple or dual representation. *See, e.g., Cuyler v. Sullivan,* 446 U.S. 335, 342–45, 100 S.Ct. 1708, 1714–17, 64 L.Ed.2d 333 (1980); *United States v. Burney,* 756 F.2d 787, 790–92 (10th Cir. 1985); *United States v. Dressel,* 742 F.2d 1256, 1259–60 (10th Cir.1984). An attorney may, however, abandon his "duty to loyalty" to his client through other sorts of conflicts as well. *Wood v. Georgia,* 450 U.S. 261, 267, 270–71, 101 S.Ct. 1097, 1101, 1103, 67 L.Ed.2d 220 (1981) (applying *Cuyler* to conflict where attorney hired and paid by defendants' employer created interests arguably adverse to defendants); *Government of Virgin Islands v. Zepp,* 748 F.2d 125, 136 (3d Cir.1984) (attorney could have been indicted for same crime and testified against defendant); *United States v. Hoffman,* 733 F.2d 596, 601–02 (9th Cir.1984) (attorney had potential conflict between duties to defendant and the state); *United States v. Hearst,* 638 F.2d 1190, 1193 (9th Cir.1980) (attorney possibly more concerned with publicity than with client's best interests). Similarly, an attorney who adopts and acts upon a belief that his client should be convicted "fail[s] to function in any meaningful sense as the Government's adversary." *Cronic,* 466 U.S. at 666, 104 S.Ct. at 2051. Whether the attorney is influenced by loyalties to other defendants, third parties, or the government, "if [he] entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights." *Id.* at 659, 104 S.Ct. at 2047.

The state's duty to ensure effective assistance of counsel goes further than actual breakdowns in the adversary process.

In *Strickland,* the Supreme Court considered when a defense attorney may be constitutionally ineffective "simply by failing to render 'adequate legal assistance.'" 466 U.S. at 686, 104 S.Ct. at 2064 (quoting *Cuyler,* 446 U.S. at 344, 100 S.Ct. at 1716). When the trial or sentencing process is rendered unreliable because it has clearly lost its adversary character, the Sixth Amendment violation is clear. When an ineffectiveness claim rests exclusively on the inadequacy of an attorney's strategic legal decisions, however, the process retains its formal adversary nature. In this situation, the defense attorney may have advocated his client's interests to the best of his ability. Nevertheless, the Court has held that if the attorney's inadequacies fall below that of a reasonably competent attorney and his errors may have affected the result, the proceeding, though formally adversarial, is deemed inadequate to satisfy the Sixth Amendment. *See Strickland,* 466 U.S. 686, 104 S.Ct. at 2063.

The Court in *Strickland* adopted a two-prong test to help lower courts determine when errors in legal decision-making alone effectively render the guilt determination process nonadversarial. First, an attorney should be judged by an objective reasonableness standard focusing on the defense attorney's knowledge at the time of the relevant proceeding. *Id.* at 687–88, 104 S.Ct. at 2064–65. Reviewing courts should avoid hindsight and second-guessing, and extend deference to counsel's tactical judgments. *Id.* at 689, 104 S.Ct. at 2065. Courts must, however, determine whether the attorney fulfilled his duty to make reasonable investigations or to determine reasonably that such investigations were not necessary. *Id.* at 691, 104 S.Ct. at 2066. We have defined this reasonableness standard as "the 'exercise [of] the skill, judgment and diligence of a reasonable competent defense attorney.'" *Burney,* 756 F.2d at 790 (quoting *Dyer v. Crisp,* 613 F.2d 275, 278 (10th Cir.) (en banc), *cert. denied,* 445 U.S. 945, 100 S.Ct. 1342, 63 L.Ed.2d 779 (1980)).

Second, the defendant must show that he was prejudiced by his counsel's errors. Al-

though the Court intended the prejudice standard to be flexible, *see Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069, it emphasized that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. at 2068. Instead, the defendant bears the burden of showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[12] *Id.* at 694, 104 S.Ct. at 2068.

■ Although the underlying issue in an ineffectiveness claim is always the adversary nature of the process, the Court's decisions in *Strickland* and *Cronic* suggest that the convicted defendant can pursue an ineffectiveness claim in two ways. He can assert that the process was not adversarial because of affirmative state interference or a conflict of interest, and/or he can argue that his attorney was so inadequate that he was effectively denied the benefit of full adversarial testing of his guilt. *See Zepp*, 748 F.2d at 131–32; *cf. Burger v. Kemp*, — U.S. —, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (engaging in separate inquiries). When a defendant challenges the adequacy of his counsel's performance, he must meet the *Strickland* reasonableness and prejudice requirements. *See Burger*, 107 S.Ct. at 3123; *Zepp*, 748 F.2d at 132. Conversely, "a defendant who

shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. at 1718–19; *see Holloway*, 435 U.S. at 488, 98 S.Ct. at 1180; *but see Burger*, 107 S.Ct. at 3120 (mere possibility of prejudice inherent in every instance of multiple representation does not establish presumption). When an actual conflict of interest is demonstrated, prejudice is presumed because "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067.

■ In this case, the district court held that Osborn's counsel was constitutionally ineffective at both the guilty plea and sentencing stages.[13] The court based its conclusion on specific fact findings, which may not be disturbed on appeal unless they are clearly erroneous. *Griffin v. Winans*, 684 F.2d 686, 689–90 (10th Cir.1982). We conclude that these findings are amply borne out by the record and provide persuasive support for the court's decision to grant habeas relief. *See Osborn*, 639 F.Supp. at 615–18.

The district court found that the strategy of Osborn's counsel was to talk the prosecutor out of seeking the death penalty prior to or at the sentencing hearing. *Id.* at 616. When the prosecutor insisted on pursuing the death penalty, defense counsel was left unprepared. *Id.* This lack of preparation

---

**12.** At the sentencing phase of a capital trial, the Court held that the standard becomes "a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069. Although the *Strickland* standards are applicable in all trial-like situations, they are not to be applied mechanically, but rather must conform to the posture of the particular case. *Id.* at 696, 104 S.Ct. at 2069. Thus, the minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death, justify a court's closer scrutiny of attorney performance at the sentencing phase. *See id.* at 704–06, 104 S.Ct. at 2073–74 (Brennen, J., concurring); *see also Cronic*, 466 U.S. at 666, 104 S.Ct. at 2050 (gravity of the charge may

affect what a reasonably competent attorney would be expected to do).

**13.** This case involves a collateral attack alleging ineffectiveness after the Wyoming Supreme Court had found the defense attorney's performance constitutional. However, the Supreme Court has emphasized that the standards it set apply to both direct appeal and collateral review. *Strickland*, 466 U.S. at 697–98, 104 S.Ct. at 2069–70; *Kimmelman*, 106 S.Ct. at 2582 (holding that collateral review is appropriate even when the underlying error is based on the Fourth Amendment). In addition, the Court has asserted that state court findings of effectiveness are not binding on the federal courts, because both performance and prejudice are mixed questions of fact and law. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070.

forced him to rely on the argument that Osborn's participation in the crimes was more limited than that of his co-defendants, who were not sentenced to die.[14] If Osborn's counsel had made a tactical decision after adequate investigation and reasoned judgment to rely on this lone argument, we would not consider it completely untenable. In this case, however, the district court found and the record confirms that defense counsel completely failed to investigate other plausible lines of defense and was inadequately prepared to effectively present the tactical defense he chose. *See id.* at 616–17. "[I]n a capital case the attorney's duty to investigate all possible lines of defense is strictly observed." *Coleman,* 802 F.2d at 1233; *cf. Burger,* 107 S.Ct. at 3126 (less than complete investigation justifiable only "to the extent that reasonable professional judgments support the limitations on investigation") (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066)).

Counsel did not have to prepare for a trial because Osborn had pled guilty. Even though counsel's sole responsibility was to argue the sentencing question, the district court found that he did little in preparation. *Osborn,* 639 F.Supp. at 616–17. "It should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness." *Blake v. Kemp,* 758 F.2d 523, 533 (11th Cir.1985), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985). Here, counsel failed to uncover mitigating family background witnesses and medical history when both were available.

More importantly, counsel did not object to prejudicial ex parte information provided to the trial court before sentencing that indicated Osborn was the ringleader of the group. *Osborn,* 639 F.Supp. at 617. The introduction of such information may well have been unconstitutional. *See Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977) (denial of due process to impose death penalty on basis of information defendant had no opportunity to deny or explain). Counsel's failure to contact co-defendant Teel's attorney to discover who Teel thought was the ringleader undermined counsel's ability to challenge this ex parte information.[15] *Osborn,* 639 F.Supp. at 617. Counsel was not adequately prepared to argue, as he attempted to do, that Osborn was no worse than his cohorts who were not sentenced to die. *Cf. Coleman,* 802 F.2d at 1234 (when only one line of defense available, counsel must investigate it). Counsel did not have transcripts from, nor did he attend, the co-defendants' plea hearings. *Osborn,* 639 F.Supp. at 617. He never conferred with co-defendant Green, who later testified at the federal habeas hearing that he was the leader. Although counsel called a psychiatrist who had examined Osborn, he did nothing to prepare this witness. Counsel never inquired about comparisons between Osborn's and Green's psychiatric history although the doctor had examined both men. At the habeas hearing, the psychiatrist testified that Green was more violent and aggressive than Osborn.

Once his strategy of convincing the prosecutor to forgo the death penalty failed, counsel was required to proceed with a sentencing hearing for which the district court found he was not prepared. *Id.* at 617. Even granting deference to counsel's choices, we cannot conclude that he "reasonably determined that he need not undertake further investigation," before proceeding with an argument he was wholly unprepared to make. *Burger,* 107 S.Ct. at 3126. We agree with the district court that this

---

**14.** Counsel had Osborn testify to his background, he cross-examined the prosecution's key witness in an attempt to discredit her testimony, he called a psychiatrist who had examined Osborn, and he argued that although not incompetent to be found guilty, the defendant's mental "sickness" warranted mercy. Finally, he argued

that execution was inappropriate because Osborn's co-defendant committed more murders and was not sentenced to death.

**15.** The record suggests that before he was murdered in jail by co-defendant Green, Teel may have indicated that Green was the ringleader.

performance did not meet constitutional standards.

In addition, the district court's findings clearly establish that Osborn's attorney so abandoned his "overarching duty to advocate the defendant's cause," *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064, that the state proceedings were almost totally non-adversarial. *Osborn,* 639 F.Supp. at 615–16. Evidence of this abandonment came to light when Osborn decided that he wanted to withdraw his guilty plea. The district court found that Osborn's counsel made statements to the press indicating that Osborn had no evidence to support his claims and that he was playing a game to attract attention. *Id.* at 615. Publicly chastising a client is evidence of ineffectiveness. *See United States ex rel. Zembowski v. DeRobertis,* 771 F.2d 1057, 1064 (7th Cir.1985). The district court correctly asserted that "[s]uch statements could easily have come from the prosecutor, rather than defendant's counsel." *Osborn,* 639 F.Supp. at 616.

Counsel's actions in regard to sentencing even more clearly indicate the abandonment of his duty of loyalty. At the federal habeas hearing, Osborn's counsel admitted that he had made public statements to the effect that Osborn was not amenable to rehabilitation, and conceded that such statements "probably" did not help his client's chances to avoid the death penalty. Supp. rec. vol. 12, at 186–87. In addition, although counsel knew or should have known that the prosecutor's office had conveyed ex parte information to the sentencing court, counsel never sought to discover its contents or counteract its effect. See *Osborn,* 639 F.Supp. at 617. This information indicated that Osborn was the leader of the group of four criminals, the key factor that convinced the sentencing judge to impose the death sentence. Counsel's

testimony at the habeas hearing suggests that he did not challenge the ringleader assertion because he believed it correct; that conflicting evidence existed was apparently of no moment to him. Defense counsel must present conflicting evidence to the court, not judge the issue for himself. *See Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 1006, 89 L.Ed.2d 123 (1986) (Blackman, J., concurring in judgment) ("Except in the rarest of cases, attorneys who 'adopt the role of the judge or jury to determine the facts,' pose a danger of depriving their clients of the zealous and loyal advocacy required by the Sixth Amendment.") (quoting *United States ex rel. Wilcox v. Johnson,* 555 F.2d 115, 122 (3d Cir.1977) (citation omitted)).

The most striking indication of counsel's failure to fulfill his duty of loyalty to his client is apparent from his behavior at the sentencing trial itself. The district court described it as follows:

"Counsel's arguments at the sentencing hearing stressed the brutality of the crimes and the difficulty his client had presented to him. At the beginning of the hearing, counsel referred to the difficulty of presenting mitigating circumstances when evidence against a client is overwhelming. In closing, counsel referred to the problems Osborn's behavior had created for counsel throughout the representation. *Counsel described the crimes as horrendous. He analogized his client and the co-defendants to 'sharks feeding in the ocean in a frenzy; something that's just animal in all aspects.'* "

*Osborn,* 639 F.Supp. at 617 (emphasis added).[16] *Cf. King v. Strickland,* 748 F.2d 1462, 1464 (11th Cir.1984) (holding counsel ineffective in part because argument at

---

**16.** At the habeas hearing Osborn's attorney also stated "[a]nd I know that what you are wanting to get to is how far do we go with nonstatutory circumstances? Somebody has to draw a line. I draw the line." Supp. rec., vol. 7, at 191. That the state is not permitted to draw such a line is the clearest principle in modern death penalty jurisprudence. *See, e.g., Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 1824, 95 L.Ed.2d

347 (1987) (unanimously holding that sentencer cannot be precluded from hearing or cannot refuse to consider any relevant mitigating evidence). Certainly, the constitutional violation is not avoided when a public defender with no view towards helping his client takes it upon himself to limit nonstatutory mitigating circumstances.

sentencing hearing "unnecessarily stressed the horror of the crime").

The problems do not end there. After the sentencing hearing, counsel responded to a request to evaluate the district judge's performance. Counsel informed the judge in a letter, subsequently submitted to the state supreme court hearing Osborn's appeal, that in essence his client deserved the death sentence, that the defendant brought it on himself. Although counsel was in the process of arguing the appeal when he wrote this letter, he insisted that whether it helped his client "wasn't my concern." Supp. rec., vol. 12, at 168.

Osborn's counsel was an experienced criminal attorney who had previously argued and won capital cases. In a typical case where an attorney's loyalty is questioned, the reason for his divided allegiance is relatively clear, while its effect on his representation is questionable. Here the opposite is true. No particular reason for defense counsel's behavior is apparent, although he repeated many times that Osborn was an extremely difficult client, and that he had another very high profile capital case before the Wyoming courts at the same time as this one. Whatever the reason, the record supports the district court's finding that defense counsel turned against Osborn, and that this conflict in loyalty unquestionably affected his representation. A defense attorney who abandons his duty of loyalty to his client and effectively joins the state in an effort to attain a conviction or death sentence suffers from an obvious conflict of interest. Such an attorney, like unwanted counsel, " 'represents' the defendant only through a tenuous and unacceptable legal fiction." *Faretta v. California*, 422 U.S. 806, 821, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562 (1975). In fact, an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition. As the Supreme Court has asserted:

"The right to effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing.... [I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated."

*Cronic*, 466 U.S. at 656–57, 104 S.Ct. at 2045.

We base our conclusion that Osborn did not receive effective assistance of counsel on the clear evidence that the process by which he pled and was sentenced to death was not adversarial, and therefore was unreliable. The performance of Osborn's counsel was constitutionally unreasonable, but more importantly, the evidence presented at his habeas hearing overwhelmingly established that his attorney abandoned the required duty of loyalty to his client. Osborn's attorney did not simply make poor strategic choices; he acted with reckless disregard for his client's best interests and, at times, apparently with the intention to weaken his client's case.

Prejudice, whether necessary or not, is established under any applicable standard. *See Osborn*, 639 F.Supp. at 616. Although Osborn may be guilty of several horrible crimes,[17] the state court might not have accepted his guilty plea if his counsel had actively advocated his interests. Counsel knew Osborn was only pleading guilty in an attempt to get the ACLU interested in his case. Nevertheless, he made every effort to ensure that the court would accept his client's plea. Even assuming that Osborn might have insisted on pleading guilty, a true advocate would have attempted to convince the state to allow Osborn to withdraw his plea before sentencing. Defense counsel here did nothing while ACLU attorneys unfamiliar with the case hastily prepared a motion to withdraw Osborn's guilty plea. Once the motion was filed, counsel informed the press that the motion

17. "[W]e have never intimated that the right to counsel is conditioned upon actual innocence." *Kimmelman*, 106 S.Ct. at 2586.

was, in his opinion, meritless. His public acknowledgement of his doubts about the merits of the issue not only infected the immediate decision of the state trial court, but also that of the state supreme court to whom counsel argued on appeal the very same issue he had publicly pronounced untenable.

Finally, we believe it significant that counsel admittedly disregarded evidence that Osborn was not the ringleader. The state court's decision to impose the death penalty, as its order indicates, was based on its belief that Osborn was the ringleader. This belief might have been refuted or at least significantly undermined had Osborn had a true advocate in the courtroom. Under these circumstances, we cannot conclude that the district court erred in finding that Osborn's counsel's behavior prejudiced his case. With an effective advocate in his corner, a "reasonable probability" exists that the court might never have accepted Osborn's guilty plea nor sentenced him to death.

## IV.

### CONDITIONAL WRIT

■■■ The district court ordered Osborn's case remanded to state court to allow Osborn to withdraw his plea, enter a new plea, and be tried and/or sentenced. The court ordered that these proceedings take place before a different state court judge in a different location. We view the district court's "remand" order as, in effect, the issuance of a conditional writ. *Accord Magwood v. Smith,* 791 F.2d 1438, 1448 (11th Cir.1986). The State contends that the conditions imposed by the court below in granting habeas relief exceeded its authority.

"Federal courts are authorized, under 28 U.S.C. § 2243, to dispose of habeas corpus matters 'as law and justice require.'" *Hilton v. Braunskill,* 481 U.S. 770, 107 S.Ct. 2113, 2118, 95 L.Ed.2d 724 (1987). The Supreme Court has recently emphasized that section 2243 vests a court with "broad discretion in conditioning a judgment granting habeas relief." *Id.* The record

before us reflects that the judge who took Osborn's guilty plea and sentenced him to death received numerous ex parte communications pertinent to those proceedings. The vice of such ex parte information is that Osborn's death penalty may have been imposed, "at least in part, on the basis of information which he had no opportunity to deny or explain." *Gardner,* 430 U.S. at 362, 97 S.Ct. at 1207. Osborn and his present counsel have since learned of the content of some of these communications and would therefore presumably be able to rebut them in new proceedings. However, the record clearly indicates that other such communications may well have occurred, the existence and content of which Osborn has no way of ascertaining. Under these circumstances, we do not believe the lower court abused its broad discretion in requiring that new state proceedings be held under circumstances fashioned to eliminate any lingering effects of ex parte knowledge of the case.

## V.

### CONCLUSION

In sum, we affirm the district court's conclusion that Osborn was denied his Sixth Amendment right to effective assistance of counsel and is therefore entitled to withdraw his guilty plea. In light of this holding, we need not address the voluntariness and ex parte communication issues. The State must now provide Osborn with an adversarial adjudicative process in which these problems are not likely to arise.

We affirm the decision of the district court to grant the writ. In so doing, we note that "[g]enerally, a district court ruling in the petitioner's favor in a habeas case provides a reasonable time in order to afford the State an opportunity to ... correct the constitutional infirmity." *Bowen v. Maynard,* 799 F.2d 593, 614 n. 12 (10th Cir.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 458–59, 93 L.Ed.2d 404 (1986). Because the district court did not do so here, we modify the judgment to provide that the State conduct Osborn's new proceedings within a reasonable time or be subject to further

federal proceedings to consider Osborn's release.  *See Martinez v. Turner,* 461 F.2d 261, 265 (10th Cir.1972).

AFFIRMED.